**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JEFFERSON COUNTY,<br><br>Plaintiff,<br><br>v.<br><br>DANNIE E. WILLIAMS, M.D., RICHARD S. SACKLER, M.D., CEPHALON, INC., TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC., NORAMCO, INC., DEPOMED, INC., ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS, INC., ALLERGAN PLC, WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC., MALLINCKRODT, PLC, MALLINCKRODT LLC, SPECGX LLC, MYLAN PHARMACEUTICALS INC., CARDINAL HEALTH, INC., MCKESSON CORPORATION, AMERISOURCEBERGEN DRUG CORPORATION, AMERISOURCEBERGEN CORPORATION, HUNT FITZ DRUG, INC. D/B/A KELLER APOTHECARY, EXPRESS SCRIPTS PHARMACY INC., WAL-MART, INC., TARGET CORPORATION, WALGREEN COMPANY, MISSOURI CVS LLC, EXPRESS SCRIPTS HOLDING COMPANY, EXPRESS SCRIPTS, INC., CVS HEALTH CORPORATION, CAREMARKPCS HEALTH, LLC, CAREMARK, LLC, UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., OPTUMRX, INC. DELMAR PRIMARY CARE ASSOCIATES, LLC, and GURPREET S. PADDA, M.D.,<br><br>Defendants. | Case No. ____________________<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

In accordance with 28 U.S.C. §§ 1442(a) and 1446, OptumRx, Inc. removes the civil action captioned *Jefferson County v. Williams et al.*, No. 20JE-CC00029, pending in the Missouri Circuit

Court for the Twenty-Third Judicial Circuit to the United States District Court for the Eastern District of Missouri, Eastern Division. A copy of the operative Second Amended Petition (**SAP**) in the state-court action is attached as Exhibit A; all other process, pleadings, and orders served Optum Rx or that Optum Rx obtained from the case docket for the State Court Action are attached as Exhibit B; and the state court docket sheet is attached as Exhibit C. Removal is proper for the reasons set for in the following paragraphs.

## I. INTRODUCTION

1. This case has been removed before by Optum Rx and another PBM, Express Scripts. But this new removal rests on materially different grounds. The previous removal arose from the County's "red flag" analysis, which identified prescription claims from Optum Rx's data that the County intended to rely on to establish liability. The Eighth Circuit held that the County's service of its red flag analysis in February 2022 made the federal basis for that theory ascertainable and thus started the 30-day removal clock. But the Eight Circuit did not hold that later developments could never make the case removable again on other grounds. Now, the County's recently disclosed expert reports present a new *factual basis* for removal.

2. On October 1, 2026, the County served six new expert reports that substantially changed its case. Those reports introduce new experts and new methodologies. At least one relies on previously undisclosed national survey data to support the County's requested abatement remedy. Significantly, these reports do not merely seek to support the County's liability theory, but they also calculate the County's alleged harms and proposed abatement measures using data that encompass members of federal health plans and that do not exclude costs attributable to those federal plans. The County thus now relies on Optum Rx's federally directed work in a way that was not implicated by its earlier red flag analysis.

3. That distinction matters. The red-flag analysis addressed which prescriptions supported the County's liability theory. The new reports use new and different evidence to establish the scope of the alleged harm and the abatement remedy the County seeks. Indeed, after the previous remand to state court, the County represented to the state court that its approach to remedies did not implicate federal programs. Its new expert reports reveal otherwise.

4. Federal law permits successive removals when later developments supply a new factual basis for federal jurisdiction. That is what happened here. The last time this case was removed, the Eighth Circuit held that the clock began in February 2022 for the removal theory disclosed by the red flag analysis. But it did not start the clock for a materially different theory that had not yet been disclosed. Indeed, the Eighth Circuit has recognized that the relevant question in a successive removal is whether a later development presents a different factual basis underlying the new removal theory. *E.g.*, *City of Creve Coeur v. DirecTV LLC*, 58 F.4th 1013, 1016 (8th Cir. 2023).

5. The County's new expert reports do not merely provide additional support for an old ground for removal. Rather, they introduce and reply on a new factual predicate for federal-officer jurisdiction: the County seeks an abatement remedy based on expert analyses that encompass federal-plan populations and rely on never-before-disclosed national survey data, thereby implicating work that Optum Rx performed under color of federal office. Because that basis for removal first became ascertainable from the expert reports served on October 1, 2026, this removal is timely under 28 U.S.C. § 1446(b)(3).

## II. BACKGROUND

6. This case is one of many filed nationwide by government entities seeking to recoup costs allegedly incurred in response to third parties' misuse of lawful medications: prescription opioids approved by the U.S. Food & Drug Administration (**FDA**) for the treatment of pain. Most

of those cases were filed in, or removed to, federal court and then centralized in a federal multidistrict litigation in the Northern District of Ohio, *In re National Prescription Opiate Litigation*, No. 1:17-md-2804 (the **Opioid MDL**). The plaintiffs in those cases generally allege that manufacturers, distributors, and retail pharmacies engaged in a fraudulent scheme to expand the prescription opioid market by misleading doctors and the public about the addictive nature of prescription opioids.

7. In this lawsuit, Plaintiff, Jefferson County, Missouri, brings a claim for public nuisance as well as other state-law claims, against Optum Rx and other defendants, seeking to recover for costs allegedly incurred in the past, or that allegedly will be incurred in the future, as a result of opioid abuse and misuse in its community.

8. Optum Rx is a pharmacy benefit manager or "**PBM**." PBMs contracts with health plan sponsors—including federal agencies—to administer prescription-drug benefits. In particular, Optum Rx is hired to assist the U.S. Department of Veterans Affairs (**VA**) to provide health care to veterans through the Veterans Health Administration (**VHA**). Optum Rx provides PBM services to the VHA across the country, including to thousands of federal health-plan members in Jefferson County, Missouri. Optum Rx also provides PBM services to Medicare Part D health plans overseen by the Centers for Medicare & Medicaid Services (**CMS**).

9. As detailed below, on October 1, 2026, the County served a new expert report from a newly disclosed expert, Dr. Andrew Kolodny, who developed a new proposed abatement plan. Dr. Kolodny's proposed abatement plan includes funding to treat all people with opioid use disorder (**OUD**) in Jefferson County. The critical input to that analysis is the total number of people in Jefferson County with OUD who need treatment. To identify those people, Dr. Kolodny draws on a national survey that estimates that 3.7% of the United States population has OUD. But nearly

half of that population is made up of people who self-identified as members of federal health plans. In that way, through its expert report, the County seeks to recover for and implicates work that Optum Rx performed for its federal clients. This case is therefore properly removed to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), because this case and the relief that the County seeks relate to actions that Optum Rx performed under the color of federal office.

10. Courts across the country, including the Eighth Circuit, have held that PBMs—including Optum Rx—in materially similar opioid-related cases are entitled to remove the cases to federal court under the federal officer removal statute because of the PBM services provided to the federal government or work performed for federal health plans. *Griffin v. Optum, Inc.*, 175 F.4th 897, 902–05 (8th Cir. 2026); *Kentucky ex rel. Coleman v. Express Scripts, Inc.*, --- F.4th --- 2026 WL 2796078, at *2–5 (6th Cir. Sept. 18, 2026); *County of Westchester v. Express Scripts, Inc.*, 191 F.4th 82, 93–97 (2d Cir. 2026); *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 248 (4th Cir. 2021); *Mich. Att'y Gen. v. Evernorth Health, Inc.*, 2026 WL 880145, at *3–4 (E.D. Mich. Mar. 31, 2026); *Mississippi v. Optum, Inc.*, 2025 WL 1622390, at *8–10 (S.D. Miss. June 9, 2025); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3–8 (N.D. Ohio Jan. 12, 2023). And these types of decisions are not limited to opioid litigation; courts across the country have also held that PBMs are entitled to remove to federal court under the federal officer removal statute other cases that implicate the work that PBMs perform for federal agencies. *See, e.g.*, *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 196–99 (4th Cir. 2025); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 188–94 (1st Cir. 2024); *Ohio ex rel. Yost v. Ascent Health Servs.*, 165 F.4th 999, 1004–12 (6th Cir. 2026); *Louisiana v. Express Scripts, Inc.*, 2025 WL 3088630, at *7–12 (M.D. La. Sep. 29, 2025), *R&R adopted*, 2025

WL 3085671 (M.D. La. Nov. 4, 2025); *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *7–15 (D.N.J. June 4, 2025); *see also Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 345–49 (5th Cir. 2024) (upholding federal officer removal by Medicare plan sponsor).

11. The reasoning of those decisions applies with equal force here, where federal officer removal is proper because of Optum Rx's work for VHA and Medicare Part D plans.

12. Jefferson County has sued various entities to recoup the "public costs" that the County claims it has expended or will expend "fighting the opioid epidemic." SAP at 1. The defendants in this case originally included opioid manufacturers, distributors, retail pharmacies, PBMs, and others. Most defendants have settled with the County, leaving just three remaining: Optum Rx, Express Scripts, Inc., and Evernorth Health, Inc.

13. Optum Rx is a PBM. PBMs are very different from the manufacturers, distributors, and pharmacies that the County also sued. Unlike manufacturers, PBMs do not manufacture, market, or advertise medications. Unlike distributors, PBMs do not distribute medications. And unlike retail pharmacies, PBMs do not dispense any medications. Nor do PBMs ever take physical possession or control of medications. *See also* Order at 2, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jul. 15, 2019), Dkt. 1848 ("PBM Defendants do not manufacture, market, or prescribe opioid medications.").

14. PBMs like Optum Rx enter into service agreements with their clients—sponsors of health insurance plans—to administer their clients' prescription-drug benefits and to process insurance claims for medications that have been approved by FDA. *See* SAP ¶ 687. PBMs' clients include federal and state government agencies, Medicare Part D sponsors, employers, unions, trusts, and other health-plan sponsors who contract with PBMs to administer pharmacy benefits for their employees or members.

15. "Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* at 84. "After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Id.*

16. Optum Rx offers options to assist its clients with managing prescription-drug benefits, but it is up to plan sponsors to choose what benefits to provide to their plan beneficiaries and how to manage those benefits. In particular, plan sponsors select which medications their plans will cover (*i.e.*, what drugs are on a plan's formulary) and under what circumstances (*i.e.*, what utilization management and clinical programs, if any, are in place).

17. Like most PBMs, Optum Rx develops formularies, utilization-management tools, and clinical programs that it offers to its clients. Some plan sponsors choose to adopt Optum Rx's offerings, while others choose to customize the offerings or create their own. Regardless, the plan sponsor controls the formulary, utilization management, and clinical programs applicable to each plan that it sponsors, subject to applicable regulatory requirements. Optum Rx's role is to implement the plan sponsor's choices and administer the plan sponsor's prescription-benefit design for the plan beneficiaries.

18. As the federal district court overseeing the Opioid MDL has explained:

> As part of their nationwide offerings available to all commercial clients, each PBM Defendant offers programs or utilization-management criteria to its clients that are intended to help combat opioid abuse and addiction, and to encourage safe prescribing practices in alignment with the CDC Guideline. . . . [P]lan sponsors decide whether to adopt the programs that the PBM Defendants

> offer. The Court encourages plan sponsors—as part of their own efforts to combat opioid abuse—to consider and adopt for their members, where appropriate, the opioid programs that the PBM Defendants offer.

Order at 1–2, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jul. 15, 2019), Dkt. 1848.

19. Optum Rx also negotiates rebates (discounts) from pharmaceutical manufacturers on prescription medications. Rebate negotiations with pharmaceutical manufacturers are an important part of delivering value to the health plans that Optum Rx serves. Because medications that are excluded from a health plan's formulary typically "must be purchased out-of-pocket by consumers," manufacturers generally hope to have their drugs included on formularies. *Puerto Rico*, 119 F.4th at 180. Although a medication's inclusion on a formulary is determined by independent, clinically driven evaluations, manufacturers commonly offer rebates that reduce the net cost to clients if the clients select a formulary that includes the medication. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 965–66 (10th Cir. 2022). "After negotiating rebates with drug manufacturers, PBMs develop national formularies that health plans can adopt or customize in response to a particular plan's needs." *Id.* at 966. Optum Rx's clients can and do negotiate to receive some or all of those rebates, which allow Optum Rx's clients to lower their prescription-drug costs.

20. During at least part of the period at issue in County's Second Amended Petition, Optum Rx negotiated rebates across much of its entire book of business, including for VHA plans and non-federal plans alike.

21. Likewise, during at least part of the period at issue in the County's Second Amended Petition, some of the standard formulary offerings that Optum Rx developed and offered to Medicare Part D plans were based on the same ones developed and offered to non-federal plans.

**A. Procedural History**

22. On August 1, 2018, the County filed its first opioid-related case, asserting claims with ten other Missouri cities and counties against pharmaceutical manufacturers, distributors, retail pharmacies, and PBMs. *See Jefferson County et al. v. Purdue Pharma L.P.*, No. 1822-CC10883 (Mo. Cir. Ct., 22nd Jud. Cir., St. Louis City). Other defendants removed the case to federal court in August 2018 under the Class Action Fairness Act (**CAFA**). *See* No. 4:18-cv-01477 (E.D. Mo. Aug. 31, 2018). The County voluntarily dismissed the case on November 1, 2018. *Id.*, Dkt. 82.

23. On January 29, 2019, the County filed a new case, this time with nineteen other Missouri cities and counties. *Jefferson County et al. v. Williams*, No. 1922-CC00203 (Mo. Cir. Ct., 22nd Jud. Cir., St. Louis City). Then-defendant CVS Pharmacy, Inc. removed the case under CAFA before Optum Rx (or any other defendant) was served. *See* No. 4:19-cv-00157 (E.D. Mo. Jan. 31, 2019). The case was then transferred to the Opioid MDL. *Id.*, Dkt. 21.

24. On July 11, 2019, the Opioid MDL court issued a scheduling order acknowledging that two Missouri state court judges had contacted it to request the remand of "a small number of cases brought by cities or counties within that same geographic region that were removed from their jurisdictions and landed in this MDL." Scheduling Order No. 2 at 1, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio July 11, 2019), Dkt. 1828. One of those Missouri judges submitted a letter requesting that the Opioid MDL court sever the claims of Jefferson County and Franklin County, Missouri from the Opioid MDL and remand those cases to Missouri state court to be consolidated with another case. *Id.* at 1–2. Optum Rx and other defendants asserted written objections. *See* Opioid MDL Dkt. 1931. On July 24, 2019, the Opioid MDL court severed and remanded the Jefferson County and Franklin County cases to Missouri state court after

concluding that the claim of removal jurisdiction under CAFA was "very tenuous." Opioid MDL Dkt. 1987.

25. On October 21, 2019, the County filed its First Amended Petition. Jefferson County was then severed from Franklin County and transferred to the Twenty-Third Judicial Circuit in Jefferson County on December 20, 2019. On June 15, 2020, the County filed its Second Amended Petition, which remains the operative complaint.

**B. The County's Prior Treatment of Federal Plans and Resulting Stipulations**

26. In its Second Amended Petition, the County alleges that PBMs, including Optum Rx, acted as a "gatekeepers of prescription drugs including opioids" and that the PBMs contributed to an opioid crisis in Jefferson County by "controlling which pain medications reach the marketplace . . . through their self-serving formulary design." SAP ¶¶ 665, 713.

27. The County did not, in its Second Amended Petition or any previous pleading, identify any specific formularies, prescriptions, or health plans at issue in the case.

28. The County subsequently expressly stated that its claims did not pertain to federal health plans in connection with which the PBMs provided services. *See* Pl.'s Opp'n to Mot. to Dismiss at 19 (April 6, 2020).

29. In discovery, the County agreed to disclose the scope of its liability theory by identifying what it described as "red flag" criteria—the alleged indicators or warning signs that the County contended could suggest problematic prescriptions—and to apply those criteria to the prescription claims data that the PBMs had produced to the County. (Optum Rx does not endorse or agree with the County's use of the language of "red flag" criteria but uses that terminology for the sole purpose of describing the County's allegations and contentions.) The purpose of the red flag analysis was to allow the PBMs to understand which prescription claims the County was relying on to support its case so that the PBMs could prepare their defenses.

30. The County subsequently served a variety of analyses identifying the challenged prescription claims at issue, with its final red flag analysis served on February 14, 2022 (the "Red Flag Analysis"). That submission suggested—for the first time—that the County's liability theory included and implicated prescription claims adjudicated or processed for federal health plans.

31. The PBMs notified the County by letter on March 10, 2022 that they intended to remove this action to federal court unless the County (1) withdrew its challenges to federal prescription claims and (2) agreed to not seek recovery from the PBMs based on the federal prescription claims, including claims adjudicated or processed for a plan controlled or sponsored by a federal governmental department or entity.

32. The County responded in writing on March 11, 2022, stating that the "County agrees it is not challenging federal prescription PBM claims (including seeking recovery from the PBMs for same) in the instant state court proceeding."

33. To memorialize that position, the County entered into a Joint Stipulation and Consent Order with the PBMs on March 16, 2022. The stipulation provided that the County "will not now or at any time in the future in this state court litigation seek to establish liability against any of the PBM Defendants in connection with any Federal Plan." Exhibit D ¶ 1.

34. The stipulation defined "Federal Plan" as "any health care plan that is fully or partially funded by the federal government, any plan that is administered for any federal agency, or any plan that is delegated for administration by any federal agency. Federal Plans include, but are not limited to TRICARE, Federal Employment Health Benefits Act ('FEHBA') plans, Employer Group Waiver Plans ('EGWP'), and Medicare Part D plans." *Id.*

35. The County further stipulated that it "will not now or at any time in the future in this state court litigation take the position or pursue any argument suggesting that the PBM

Defendants' conduct relating to prescription claims for Federal Plans caused an oversupply of prescription opioids in Jefferson County, contributed to the theories of liability against the PBMs upon which Jefferson County bases its lawsuit, or caused or contributed to the harms for which Jefferson County seeks recovery." *Id.* ¶ 2.

36. The Honorable Joseph Rathert of the Missouri Circuit Court, Twenty-Third Judicial Circuit, signed the Joint Stipulation and Consent Order on March 17, 2022.

37. In July 2022, the County entered into a second Joint Stipulation and Consent Order with Optum Rx. In Paragraph 4, the County represented that it "will not now or at any time in the future in this state court proceeding seek to establish liability against [Optum Rx] in connection with any Federal Plan." The County agreed that for purposes of the stipulation, "[a] 'Federal Plan' means any health care plan that is fully or partially funded by the federal government, any plan that is administered for any federal agency, or any plan that is delegated for administration by any federal agency" and that such Federal Plans include "TRICARE, Federal Employment Health Benefits Act ('FEHBA') plans, Employer Group Waiver Plans ('EGWP') and Medicare Part D plans." Exhibit E ¶ 4.

38. The County further agreed that it "will not now or at any time in the future in this state court proceeding take the position or pursue any argument suggesting that the Optum Entities' conduct relating to prescription claims for Federal Plans caused an oversupply of prescription opioids in Jefferson County, contributed to the theories of liability against [Optum Rx] upon which the County bases its lawsuit, or caused or contributed to the harms for which the County seeks recovery." *Id.* ¶ 5.

39. Judge Rathert signed the second Joint Stipulation and Consent Order on July 19, 2022.

40. Optum Rx litigated this case for the next year and a half in good-faith reliance on the two stipulations (the **Federal-Plan Stipulations**).

**C. Optum Rx's First Removal to Federal Court**

41. On November 15, 2023—after more than a year of Optum Rx's good-faith reliance on the Federal-Plan Stipulations—the County served on the PBMs three expert reports explaining the County's liability theories. The County's experts relied on the County's Red Flag Analysis, which expressly implicated prescription claims for all of the PBMs' clients, both federal and non-federal. *See* Notice of Removal ¶¶ 38, *Jefferson County v. Williams*, No. 4:23-cv-01539 (E.D. Mo. Dec. 1, 2023), Dkt. 1.

42. The County's liability expert reports therefore disclosed that, notwithstanding the Federal-Plan Stipulations, the County's claim for relief was based on tens of thousands of prescriptions adjudicated for federal plan members. *Id.* ¶ 37.

43. Believing that the County's November 2023 expert reports unambiguously revealed for the first time that, notwithstanding the Federal-Plan Stipulations, the County sought to hold the PBMs liable for their work performed on behalf of the federal government, Optum Rx and Express Scripts removed this case to federal court on December 1, 2023. *See id.*

44. The County moved to remand the case back to state court. The federal district court granted the motion to remand, holding that removal was untimely because the 30-day clock for removal ran from February 14, 2022, when the County served its final Red Flag Analysis, not November 15, 2023, when the County served expert reports relying on the Red Flag Analysis. *Jefferson County v. Williams* (*Jefferson County I*), 2024 WL 1014063, at *4 (E.D. Mo. Mar. 8, 2024). In a footnote, the district court also credited the County's argument that removal would have failed anyway because the County disclaimed liability related to federal claims when it entered into the Federal-Plan Stipulations. *Id.* at *5 n.12 ("[T]his Court is unpersuaded that a causal

connection is present to allow removal."). In doing so, the district court analyzed the Federal-Plan Stipulations and concluded that "because Plaintiff disclaimed all challenges related to federal prescription claims in the Stipulations entered between the parties, the charged conduct [alleged by the County] only relates to non-federal prescription claims." *Id.*

45. Optum Rx and Express Scripts appealed the district court's remand order to the U.S. Court of Appeals for the Eighth Circuit. In its briefing before the Eighth Circuit, the County agreed that the Federal-Plan Stipulations are binding and enforceable, asserting that "[i]f the PBMs actually believe the County is not complying with its obligations under those documents, the PBMs can seek to enforce their terms." Brief of Plaintiff-Appellee at 16, *Jefferson County v. Express Scripts, Inc.*, No. 24-1550 (8th Cir. Aug. 9, 2024). In July 2025, the Eighth Circuit affirmed remand, but only because of the removal's timeliness. *Jefferson County v. Williams* (*Jefferson County II*), 146 F.4th 658, 663 (8th Cir. 2025). The court held that the County's service of the Red Flag Analysis on February 14, 2022 triggered the 30-day clock for removal because it disclosed that the County's liability theory implicated the PBMs' work for federal plans. *Id.* The Eighth Circuit further held that the County's disclaimer of reliance on federal plans before again advancing a liability theory that relied on the Red Flag Analysis did not reset the clock. *Id.* at 663–64. The court did not reach the district court's alternative basis for remand that the Federal-Plan Stipulations sufficiently disclaimed any reliance on the PBMs work for federal plans. *Id.* at 664 n.5. The Supreme Court has since abrogated the causal-nexus standard that the district court applied. *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026). And the Eighth Circuit has since held in another opioid case against PBMs, including Optum Rx, that "no disclaimer, however worded, can help" a plaintiff "avoid a causal nexus between" a PBM's "conduct on behalf of the federal government and" a plaintiff's opioid-related claims. *Griffin*, 175 F.4th at 904.

**D. New Grounds for Removal**

46. After the Eighth Circuit affirmed remand and this case returned to state court, the PBMs moved to enforce the Federal-Plan Stipulations based on the November 2023 expert liability reports that had prompted removal.

47. At a December 18, 2025 hearing on the PBMs' motion to enforce, the County represented that it was "in the process of" redoing those reports to cure the defects and argued that the PBMs could refile their motion after reviewing the new expert reports. The court asked the County point-blank "what federal programs, if any," it was including in its approach to its requested remedies. Dec. 18, 2025 Tr. at 23:2–5. The County was unambiguous: "[c]urrently none"—*i.e.*, its approach to its requested remedies *did not include* (and had not included) any reliance on or implication of federal plans. *Id.* at 23:6. Based on those representations, the court denied the PBMs' motion to enforce without prejudice and directed the PBMs to "refile the motion" if the County's new reports failed to address the problem. *Id.* at 22:19–23:24, 26:15–20. The court also observed that, depending on what the County included in its new reports, there might be yet another basis to remove the case to federal court, *id.* at 25:4–9, echoing its comments at an earlier hearing in July 2026 that "there's still a chance [the case] might be removed to federal court again" depending on how the case proceeded and whether "some other issue" might arise to trigger removal. July 10, 2026 Tr. at 34:23–25.

48. On October 1, 2026, the County served new expert reports. The County served six new expert reports (the **2026 Expert Reports**). Five of those reports are from four previously disclosed experts—Benjamin Link, Fred Rottnek, Craig McCann, and Douglas Leslie (who authored two reports)—and one is from a newly disclosed expert, Andrew Kolodny. Kolodny's liability and abatement opinions are now the centerpiece of the County's case. In addition,

although Leslie previously submitted a since-withdrawn expert report on liability, this time he offered two reports: one on liability and a second on abatement.

49. In the 2026 Expert Reports, the County's experts quantify all alleged opioid-related harms in the aggregate by relying on national survey data, which included federal health plan members, without making any effort to identify or exclude costs associated with prescriptions covered by federal plans. The 2026 Expert Reports thus provide a new factual and legal basis for removal because they rest on new opinions that rely on and implicate federal plans for calculating an abatement remedy.

50. The County's 2026 Expert Reports draw on and implicate federal plans in at least two ways: (1) Kolodny's oversupply analysis and (2) the population estimates behind the harms, damages, and abatement opinions of Kolodny, Leslie, and Rottnek. Critically, the 2026 Expert Reports not only violate the Federal-Plan Stipulations but also raise a new and different type of reliance on federal conduct by the County.

51. *First*, the County's new expert, Kolodny, runs a "simulation" in his report based on "total [opioid] MME consumption in Missouri" to measure the alleged oversupply of opioids in the County. Kolodny Rpt. ¶¶ 106–115. Based on that simulation, Dr. Kolodny concludes that the PBMs' conduct caused the "overconsumption" of opioids by individuals in Jefferson County. But he reaches that conclusion by indiscriminately including prescriptions related to federal plans when quantifying the alleged "oversupply" in his "simulation" exercise. Kolodny Rpt. ¶¶ 106–13.

52. *Second*, based on Kolodny's opinion about the PBMs' purported contribution to opioid overconsumption, the County's experts explicitly opined that the PBMs are responsible for alleged harms caused by *every* prescription opioid consumed in Jefferson County.

53. The 2026 Expert Reports collectively propose a $1.06 billion abatement plan that earmarks more than half a billion dollars to treat all Jefferson County residents whom the experts claim are suffering from OUD. The reports' estimates of the population requiring treatment—the key variable driving the cost of the proposed abatement plan—include 3.7% of Jefferson County residents whom Kolodny estimates suffer from OUD. Kolodny's estimate derives from a 2024 paper estimating the national prevalence of OUD using National Survey on Drug Use and Health data, which explicitly includes individuals with federal insurance coverage. *See* Kolodny Rpt. ¶ 347 (citing Deborah Dowell et al., *Treatment for Opioid Use Disorder: Population Estimates – United States, 2022*, CDC Morbidity and Mortality Weekly Report, vol. 73, no. 25, at 567–74 (2024), https://doi.org/10.15585/mmwr.mm7325a1); *see also, e.g.*, Dowell, *supra*, at 572 (acknowledging that it could not make "comparisons across health insurance coverage").

54. It appears that the County has abandoned its prior liability theory based on claim-specific "red flags" of abuse and diversion—which the Eighth Circuit held was the original triggering event for removal. And after abandoning that liability theory, the County made no indication of its intent to rely on federal health plans—especially for purposes of abatement—until the County served the 2026 Expert Reports. Accordingly, the County's October 2026 expert reports revealed that the County is now advancing an abatement theory that implicates and relies on Optum Rx's work for the federal government.

55. Given the Eighth Circuit's prior holding, to protect its right to removal, Optum Rx has no choice but to remove this case within 30 days of service of the 2026 Expert Reports.

## III. GROUNDS FOR FEDERAL OFFICER REMOVAL

56. A notice of removal must contain only "a short and plain statement of the grounds for removal." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) (quoting 28

U.S.C. § 1446(a)). "By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." *Id.*

57. The federal officer removal statute permits any federal officer or "any person acting under that officer" who is sued "for or relating to any act under color of such office" to remove the case to federal court. 28 U.S.C. § 1442(a)(1).

58. The statute—which Congress has consistently broadened, most recently in 2011—is an "incident of federal supremacy." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). Its "basic purpose" is "to protect the Federal Government from the interference with its operations that would ensue" if federal officers and those acting under them could be subject to trial and liability in potentially hostile state courts based on actions "within the scope of their authority." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (quotation marks omitted).

59. The Supreme Court has thus instructed that the federal officer removal statute is to be "liberally construed," *id.* at 147 (citation omitted), and has "rejected a 'narrow, grudging interpretation' of the statute," *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407).

60. In assessing whether federal-officer removal is proper, courts must "credit the [removing party]'s theory of the case." *Acker*, 527 U.S. at 432.

61. In addition, normal pleading rules do not apply. *Id.* at 431. The federal officer removal statute displaces "the 'well-pleaded complaint' rule" inasmuch as it "allows 'suits against federal officers [to] be removed despite the nonfederal cast of the complaint.'" *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (quoting *Acker*, 527 U.S. at 431) (alteration in original). The right of removal is therefore "absolute . . . regardless of whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406.

62. A defendant may remove under § 1442(a) if it satisfies "three requirements":

> First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. Second, the suit must be "for or relating to any act under color of such office." Third, the removing defendant must assert "a colorable federal defense."

*Plaquemines*, 608 U.S. at 5–6 (citations omitted); *see also Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 714 (8th Cir. 2023).

63. Optum Rx satisfies all three elements here.

**E. Optum Rx Acted Under Federal Officers.**

64. Optum Rx is a corporation, so it is a "person" under the federal officer removal statute. "Corporate entities are considered 'persons' for purposes of § 1442(a)(1)." *Kelly v. Monsanto Co.*, 2016 WL 3543050, at *7 n.13 (E.D. Mo. June 29, 2016); *see also Griffin*, 175 F.4th at 902; *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 n.3 (8th Cir. 2012) ("[T]he 'person' contemplated by the federal officer removal statute includes corporations."), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021); *Watson*, 551 U.S. at 152–53 (interchangeably discussing a "private person" and "company" when analyzing the relevant relationship under the federal-officer removal statute).

65. The "acting under" requirement contemplates a relationship in which the government exerts some "subjection, guidance, or control" over a private entity beyond mere compliance with the law. *Watson*, 551 U.S. at 151 (citation omitted). The central question is whether the private entity is helping a federal officer "fulfill other basic governmental tasks" that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54.

66. Courts broadly construe § 1442, particularly regarding private parties who claim to be "acting under" a federal officer. *Id.* at 147; *see also Sahm v. Avco Corp.*, 2023 WL 3496150, at *2 (E.D. Mo. May 17, 2023) ("courts must broadly interpret the term 'acting under'").

67. Optum Rx has "acted under" the direction of federal officers in providing PBM services to federal health plans, specifically the VA and CMS.

**1. Optum Rx Has Acted Under a Federal Officer for the Veterans Health Administration.**

68. Optum Rx has "acted under" the direction of a federal officer in providing PBM services to federal health plans, including the Veterans Health Administration (**VHA**).

69. The U.S. Department of Veteran Affairs (**VA**) is a federal executive department. 38 U.S.C. § 301(a); *see also Vasquez v. Ayudando Guardians, Inc.*, 2018 WL 922360, at *2 (D.N.M. Feb. 15, 2018) (*Bivens* claim against the VA was barred by sovereign immunity as a claim against "the United States and its agencies"); *Dambach v. United States*, 211 F. App'x 105, 107–08 (3d Cir. 2006) (similar). The VA, through the VHA, operates the largest integrated healthcare system in the United States.

70. Optum Rx has provided PBM services to the VHA since 2009. Optum Rx serves as a third-party administrator, providing PBM services to assist the VHA in providing healthcare services to millions of veterans, their dependents, and their beneficiaries each year, *see* 38 U.S.C. § 301—including members in Missouri and Jefferson County specifically. Optum Rx provides PBM services to the VHA under the detailed requirements of its contract and Performance Work Statement.

71. The relationship between Optum Rx and the VHA is an unusually close one involving detailed regulation, monitoring, and supervision. The VHA dictates nearly every aspect of its relationship with Optum Rx.

72. The VHA has its own Pharmacy & Therapeutics Committee and has complete control over and constructs its own formulary. Optum Rx does not decide what prescription drugs are covered or not covered on the VHA's formulary, nor does Optum Rx make recommendations regarding formulary design.

73. The VHA maintains complete control of claim adjudication and pricing logic.

74. Optum Rx's VHA contract requires weekly communication between the VHA Office of Community Care, Contractor, and other appropriate parties. The VHA and an Optum Rx representative communicate nearly every day and meet in person quarterly.

75. The VHA appoints a Contracting Officer Technical Representative in connection with its contract with Optum Rx. The Contracting Officer Technical Representative is responsible for (i) monitoring contract performance and immediately reporting all problems related to it to the Contracting Officer, (ii) establishing and providing to the Contracting Officer a surveillance plan that will ensure receipt of the quantity and kinds of supplies or services required by the contract, (iii) ensuring that the Contractor complies with the defined Statement of Work or specifications included in the contract, and (iv) assisting the Contractor and Contracting Officer in interpreting technical requirements of the contract scope of work or specifications and submitting any differences of opinion on these matters to the Contracting Officer for resolution.

76. The VHA subjects Optum Rx to periodic inspections to evaluate outcomes.

77. The U.S. Treasury pays Optum Rx directly for the PBM services that Optum Rx provides the VHA.

78. Optum Rx carries out functions that the VHA would otherwise have to perform itself under a contract that provides for unusually close oversight, involving detailed regulation, monitoring, and supervision from the VHA.

79. Optum Rx is thus "acting under" a federal officer when providing PBM services for the VHA, as multiple courts—including the Eighth Circuit—have held. *See Griffin*, 175 F.4th at 902 ("We conclude that the defendant companies [including Optum Rx] acted under the direction of federal officers."); *Kentucky*, 2026 WL 2796078, at *3 (holding Optum Rx is acting under the VHA because "[t]he agency consistently monitors [Optum Rx's] contract performance, oversees Optum [Rx] to ensure compliance with the contract's requirements and restrictions, and conducts inspections to evaluate outcomes"); *County of Westchester*, 191 F.4th at 95–96 (Optum Rx's VHA work satisfied acting-under element because Optum Rx "performed work that, otherwise, the . . . VHA . . . would have to perform on [its] own in fulfilling [its] respective agency mission[]."); *Mississippi*, 2025 WL 1622390, at *10 (same).

80. Numerous courts of appeals and district courts have held that when PBMs like Optum Rx provide PBM services to the federal government, they are acting under a federal officer. *See also, e.g.*, *Griffin*, 175 F.4th at 902–03; *Kentucky*, 2026 WL 2796078, at *2–3; *County of Westchester*, 191 F.4th at 94–96; *Arlington Cnty.*, 996 F.3d at 248; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *4–5; *Yost*, 165 F.4th at 1004–08; *West Virginia*, 140 F.4th at 197–98; *Puerto Rico*, 119 F.4th at 190; *Louisiana*, 2025 WL 3088630 at *8–10; *Mississippi*, 2025 WL 1622390, at *9–10; *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *7–11.

81. In providing PBM services for the VHA and other federal plans, Optum Rx at all times acted at the direction of the federal government.

### *2.* Optum Rx Acts Under a Federal Officer for Medicare Plans.

82. Optum Rx also acts under the direction of a federal officer when providing services for Medicare Part D plans.

83. "Through Medicare Part D, the Government . . . offers prescription-drug coverage to beneficiaries." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 744 (2023) (citing

42 U.S.C. § 1395w-101 *et seq.*; 42 C.F.R. § 423 *et seq.*). "To administer that coverage, CMS awards contracts to private plan sponsors." *Id.* (citing 42 U.S.C. § 1395w-115; 42 C.F.R. §§ 423.315, 423.329). Many of those plan sponsors, in turn, contract with Optum Rx to administer the pharmacy benefit for Medicare Part D plans. CMS expressly requires, among other things, that it must review and approve formularies and utilization management programs, *see* 42 C.F.R. § 423.272(b), and that it be allowed to inspect and audit the records of PBMs that plan sponsors contract with to administer benefits for Medicare plan members, *see* 42 C.F.R. § 505(b)(10).

84. CMS exercises complete control over Optum Rx's work for Medicare plans. CMS provides detailed guidance and requirements to plan sponsors and PBMs through periodic call letters, memos, and rules (some weekly, some quarterly, some annual) that dictate the content of plan coverage, including formularies and utilization management.

85. CMS then reviews and approves, on at least an annual basis, formularies, utilization management rules, communications with plan members, and other materials that Optum Rx develops for Medicare plans before they can be implemented. After implementation, CMS audits Medicare plan sponsors and their PBMs, typically annually, and at a minimum of once every three years, to ensure that the PBM is in compliance with all of CMS's requirements.

86. Optum Rx thus helps CMS carry out its duties by processing insurance claims and administering benefits that CMS would otherwise have been required to provide. In this role, Optum Rx is subject to detailed regulation, monitoring, supervision, and oversight by CMS.

87. Optum Rx is thus "acting under" a federal officer when providing services to Medicare plans. *See, e.g.*, *Caris*, 108 F.4th at 345–49 (upholding federal officer removal by Medicare plan sponsor).

**F. The County's Claims Are "For Or Relating To" Optum Rx's Actions Under Color Of Federal Office.**

88. Under the federal officer removal statute, a removing defendant must show that the plaintiff's claims are "for or relating to any act under color" of federal office. 28 U.S.C. § 1442(a)(1).

89. Before 2011, the statute allowed removal only when the plaintiff's claims were "for any act under color" of the federal office. 28 U.S.C. § 1442(a)(1) (2010).

90. In 2011, Congress passed the Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2, 125 Stat. 545. The Act added the words "or relating to" to § 1442(a)(1). A defendant may therefore now remove when the plaintiff's claims are "for *or relating to* any act under color" of federal office.

91. The Supreme Court recently ruled on the import of the 2011 amendment, holding that the 2011 amendment "broadened" the federal officer removal statute and thereby abrogated the stricter "causal connection" or "nexus" test that the Court had adopted in construing the pre-2011 version of the statute. *Plaquemines*, 608 U.S. at 11 n.3 (citation omitted); *see also id.* at 16 (Jackson, J., concurring in the judgment). *Plaquemines* clarified that the now operative "relating to" requirement for federal officer removal "sweeps broadly." *Id.* at 11 (majority opinion). "It means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with.'" *Id.* (citation omitted). "One thing can relate to another even if the connection is 'indirect,'" and even absent a "strict causal relationship." *Id.* (citations omitted). While "relating to" is not limitless, it is satisfied as long as the asserted connection is not "tenuous, remote, or peripheral." *Id.* at 12 (citation omitted).

92. When determining whether this "relating to" requirement is met, courts "credit plausible factual allegations by the removing party." *Id.* (citation omitted); *see also Acker*, 527 U.S. at 432 (courts "credit [defendants'] theory of the case" at this stage).

93. The "relating to" requirement is easily satisfied here.

94. The 2026 Expert Reports quantify all alleged opioid-related harms in the aggregate, without making any effort to identify or exclude costs associated with prescriptions covered by federal plans—including VHA and Medicare Part D plans. In other words, the 2026 Expert Reports rely on and implicate the work that Optum Rx performed for VHA and Medicare Part D plans, and other federal plans, in setting forth the Counties' abatement plan and theory.

95. As discussed above, the 2026 Expert Reports draw on and implicate Optum Rx's work for VHA and Medicare Part D plans in at least two ways: (1) Kolodny's oversupply analysis and (2) the population estimates behind the harms, damages, and abatement opinions of Kolodny, Leslie, and Rottnek.

96. *First*, Kolodny, runs a "simulation" in his report based on "total [opioid] MME consumption in Missouri" to measure the alleged oversupply in the County. Kolodny Rpt. ¶¶ 106–115. He opines that "[t]he increased prevalence of [opioid use disorder or 'OUD'] and other opioid related harms were primarily caused by a sharp increase in prescription opioid sales in Missouri and Jefferson County." Kolodny Rpt. ¶ 17(iv). He does so by indiscriminately including prescriptions related to federal plans, such as VHA and Medicare Part D plans, when quantifying the alleged "oversupply" in his "simulation" exercise. Kolodny Rpt. ¶¶ 106–13.

97. *Second*, based on Kolodny's opinion about the PBMs' purported contribution to opioid overconsumption, the County's experts explicitly opined that the PBMs are responsible for alleged harms caused by *every* prescription opioid consumed in Jefferson County.

98. The 2026 Expert Reports collectively propose a new $1.06 billion abatement plan that earmarks more than half a billion dollars to treat all Jefferson County residents whom the experts claim are suffering from OUD. The reports' estimates of the population requiring treatment—the key variable driving the cost of the proposed abatement plan—includes 3.7% of Jefferson County residents whom Kolodny estimates suffer from OUD. Kolodny's estimate derives from a 2024 paper not previously relied upon that estimates the national prevalence of OUD using National Survey on Drug Use and Health data, which explicitly includes individuals with *federal* insurance coverage. *See* Kolodny Rpt. ¶ 347 (citing Deborah Dowell et al., *Treatment for Opioid Use Disorder: Population Estimates – United States, 2022*, CDC Morbidity and Mortality Weekly Report, vol. 73, no. 25, at 567–74 (2024), https://doi.org/10.15585/mmwr.mm7325a1); *see also, e.g.*, Dowell, *supra*, at 572 (acknowledging that it could not make "comparisons across health insurance coverage").

99. The County's operative Second Amended Petition—while not expressly relying on Optum Rx's work under federal officers—helps illustrate the connection in light of the 2026 Expert Reports. The County alleges that the "overabundance of opioids has caused death, abuse, addiction, crime, and social and familial destruction in Jefferson County," and it seeks "reimbursement of public costs expended fighting the opioid epidemic" and "future costs to finance community efforts aimed at ending the crisis." SAP at 1. It casts the PBMs as "the gatekeepers of prescription drugs including opioids," *id.* ¶ 665, alleging that "the top three PBMs have the almost exclusive control over the dissemination of opioids" and thus "control which drugs are dispensed and which drugs enter communities," *id.* ¶ 687. According to the County, the PBMs' "efforts to artificially increase the number of opioid prescriptions . . . directly and predictably caused a corresponding increase in opioid abuse," *id.* ¶ 712, and "directly contributed to the

creation of the illegal diversion market" that supplied Jefferson County, *id.* ¶ 714. Without expressly speaking to federal plans, those allegations nonetheless sweep in opioid prescriptions that Optum Rx adjudicated in and around Jefferson County—including those adjudicated for the VHA, for Medicare Part D, and for other federal health plan members.

100. Multiple courts of appeals and district courts have held that similar opioid suits against Optum Rx and another PBM, Express Scripts, satisfy the "relating to" requirement. *See, e.g.*, *Griffin*, 175 F.4th at 903–04; *Kentucky*, 2026 WL 2796078, at *3; *County of Westchester*, 191 F.4th at 95–98; *Arlington Cnty.*, 996 F.3d at 256–57; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *5–6; *Mississippi*, 2025 WL 1622390, at *10.

101. Here, the County alleges that "PBMs negotiate with drug manufacturers to offer preferred drug formulary placement for the manufacturers' drugs" and earn "rebates and other incentives such as volume target bonuses negotiated with drug manufacturers." SAP ¶ 665. It alleges that "[e]very PBM Defendants' formulary is influenced by its financial arrangements with drug manufacturers," *id.* ¶ 688, and singles out Optum Rx's formulary definition, which it alleges permits modification based on "manufacturer rebate arrangements," *id.* ¶¶ 689–90. And it alleges that the PBMs "knowingly and intentionally chose to include opioids on their formularies . . . because they generated greater profits," *id.* ¶ 765, and "created formularies to ensure that an excessive number of pills were made available to users for use and abuse," *id.* ¶ 768.

102. Given those allegations, the County's abatement theory as disclosed in the 2026 Expert Reports necessarily implicates Optum Rx's work for federal plans.

103. The County's Federal-Plan Stipulations do not change the analysis. Although the County agreed not to "seek to establish liability against" Optum Rx "in connection with any

Federal Plan," Exhibit D ¶ 1, the County has broken that promise as the 2026 Expert Reports, which rely on and implicate Optum Rx's work for federal plans, demonstrate.

104. Time and again throughout this litigation, seeking to litigate its case in state court, the County has expressly represented to Optum Rx that federal plans and Optum Rx's work for federal plans are not implicated in either the County's liability or abatement theories. As recently as December 2025, the County expressly stated that "none" of Optum Rx's federal plans were implicated in the County's abatement plan. Dec. 18, 2025 Tr. at 23:6. But the 2026 Expert Reports prove otherwise. The County has not excluded any members of the public—such as veterans or Medicare beneficiaries who received prescription opioids—from the scope of the abatement relief it seeks. Indeed, as multiple courts of appeals—including the Eighth Circuit—have held, disclaiming or severing the portion of the County's alleged harm attributable to Optum Rx's services for VHA and Medicare plans is impossible. *Griffin*, 175 F.4th at 903–05. As the Second Circuit recently held, the "diffuse nature" of public-nuisance claims for "community-wide harm" underscores the challenges with any such severance because it "would still require a state court to do the disentangling of Defendants' conduct," and "[s]uch difficult factual questions about causation should be decided by a federal, not state, court." *County of Westchester*, 191 F.4th at 94; *accord Maryland v. 3M Co.*, 130 F.4th 380, 391 (4th Cir. 2025) ("The need to unravel such challenging questions . . . establishes that 3M's federal work is inextricably related to the charged conduct."); *Maine v. 3M Co.*, 159 F.4th 129, 138–39 (1st Cir. 2025); *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020).

105. To avoid removal, the County would have to show that "recovery would be barred if 'even a morsel of [harm]'" is attributable to prescription opioids from federal plans. *See*

*Maryland*, 130 F.4th at 392. But given its newly disclosed expert reports, the County cannot make that showing.

**G. Optum Rx Has A Colorable Federal Defense.**

106. "The Eighth Circuit has long held that '§ 1442(a)(1) does not require a court to hold that a defense will be successful before removal will be appropriate.'" *Sahm*, 2023 WL 3496150, at *4 (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)). That is because "[o]ne of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407; *see also id*. ("The officer need not win his case before he can have it removed."). Instead, the removing party need show only that it has a "colorable federal defense to the plaintiff's claims." *Sahm*, 2023 WL 3496150, at *2. "In construing the colorable federal defense requirement, [the Supreme Court has] rejected a 'narrow, grudging interpretation' of the statute.'" *Acker*, 527 U.S. at 431 (citation omitted).

107. Optum Rx has at least two independently sufficient types of colorable federal defenses: (1) a government contractor defense and (2) preemption.

**1. Government Contractor Defense**

108. The federal government contractor defense applies when (1) the United States approved reasonably precise specifications; (2) the contractor's work product conformed to those specifications; and (3) the supplier warned the United States about the risks or exposures in the use of the equipment known to the supplier but not to the United States. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *Sahm*, 2023 WL 3496150, at *5. The defense protects government contractors from state tort liability that may befall them should they carry out a federal contract. In other words, the defense "applies if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both." *Arlington Cnty.*, 996 F.3d at 255 (citation omitted).

109. Here, the government contractor defense is available to Optum Rx.

110. Optum Rx can assert the federal contractor defense because the County's theory for relief, including its proposed abatement plan, implicates residents of Jefferson County who are covered by VHA health plans. That, in turn, implicates Optum Rx's alleged failure to implement a specific formulary, specific opioid utilization limits, or specific restrictions on opioids different from those mandated by Optum Rx's VHA contract.

111. Optum Rx cannot simultaneously comply with its obligations under its VHA contract and comply with the County's interpretation of Missouri law, making a federal contractor defense colorable. *See, e.g.*, *County of Westchester*, 191 F.4th at 97–98; *Mississippi*, 2025 WL 1622390, at *8–9.

**2. Preemption**

112. Optum Rx also has colorable preemption defenses under at least two federal statutes: the Medicare Part D statute and ERISA.

113. The Medicare Part D statute incorporates the express preemption clause in the Medicare Part C statute. 42 U.S.C. § 1395w-112(g) (incorporating by reference 42 U.S.C. § 1395w-26(b)(3)). The preemption clause provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D] plans which are offered by [Plan D plan sponsors] under this part." 42 U.S.C. § 1395w-26(b)(3); *see* 42 C.F.R. § 423.440(a). This clause "is 'akin to field preemption' and precludes States from regulating Part D plans except for licensing and plan solvency." *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1206 (10th Cir. 2023) (citation omitted), *cert. denied*, 145 S. Ct. 2843 (2025); *see also Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149–53 (9th Cir. 2010).

114. Two federal courts of appeals have found Medicare preemption to be a colorable federal defense in the federal officer removal context, including the Sixth Circuit in a related opioid case against Optum Rx. *See Kentucky*, 2026 WL 2796078, at *4 (holding Optum Rx raised colorable Medicare Part D preemption defense to Kentucky's opioid claims when removing under federal officer removal statute); *Caris*, 108 F.4th at 347 (Medicare preemption argument sufficiently colorable to support federal officer removal by Medicare plan sponsor). And at least two district courts have found Medicare Part D preemption at least partially dispositive of opioid-related claims against PBMs. *See Alaska v. Express Scripts, Inc.*, 2024 WL 2321210, at *9–11 (D. Alaska May 22, 2024) (dismissing Alaska's opioid-related claims as to Express Scripts' work for Medicare Part D plans on Medicare preemption grounds); Order at 17–21, *Mississippi v. Optum, Inc.*, No. 3:24-cv-00718 (S.D. Miss. June 12, 2026), Dkt. 70 (same as to Mississippi's opioid-related claims against Optum Rx and Express Scripts).

115. ERISA, *see* 29 U.S.C. §§ 1001 *et seq.*, regulates employee benefit plans. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Congress intended ERISA to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law" by "establish[ing] the regulation of employee welfare benefit plans as exclusively a federal concern." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (quotations omitted). To that end, ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see also Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 908 (8th Cir. 2005). This provision is "expansive," *Travelers*, 514 U.S. at 655, and preempts any state law that "relates to an ERISA plan" by having "a connection with or a reference to such a plan." *Rutledge*, 592 U.S. at 86; *see also Flowers v. Caremark PCS Health, LLC*, 180 F.4th 1084, 1089 (8th Cir. 2026). This includes

common law causes of action. *Shea v. Esensten*, 107 F.3d 625, 627 (8th Cir. 1997); *see Thompson v. Gencare Health Sys., Inc.*, 202 F.3d 1072, 1073 (8th Cir. 2000) (ERISA preempts "state common law tort and contract actions asserting improper processing of a claim for benefits under an ERISA plan" (citation and quotation marks omitted)).

116. At least one federal court of appeals has found ERISA preemption to be a colorable federal defense in the federal officer removal context in a related opioid case against Optum Rx. *See Kentucky*, 2026 WL 2796078, at *4 (holding Optum Rx raised colorable ERISA preemption defense to Kentucky's opioid claims when removing under federal officer removal statute).

## IV. VENUE

117. Venue is proper in this Court under 28 U.S.C. § 1442(a) because this Court sits in the federal judicial district and division embracing the Jefferson County Circuit Court, the court from which removal is sought. *See* 28 U.S.C. § 1442(a).

## V. COMPLIANCE WITH REMOVAL PROCEDURES

### A. Consent Not Required.

118. The federal-officer removal statute does not require all defendants to consent to removal. *See, e.g., Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965) ("[I]t is settled that the filing of a petition for removal by a single federal officer removes the entire case to the federal court."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) ("Whereas all defendants must consent to removal under section 1441, a federal officer or agency defendant can unilaterally remove a case under section 1442." (citations omitted)). Thus, Optum Rx's removal of this case is proper even without the consent of any other defendant.

**B. Removal Is Timely.**

119. "[A] notice of removal may be filed within 30 days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

120. The thirty-day removal period in § 1446(b)(3) "begins running upon receipt of the initial complaint only when the complaint *explicitly* discloses" the basis for removal. *In re Willis*, 228 F.3d 896, 897 (8th Cir. 2000) (per curiam) (emphasis added). The *Willis* rule "promotes certainty and judicial efficiency," *id.*, and prevents litigants from needing to "glean" the other side's intentions. *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 974 (8th Cir. 2011).

121. If the complaint does not "explicitly disclose" the basis for removal, the time limit begins when the removing defendant receives from the plaintiff an "amended pleading, motion, order or other paper" that "set[s] forth a sufficiently detailed and *unequivocal* statement from which the defendant may *unambiguously* ascertain that the . . . jurisdictional requirements have been satisfied." *Gibson v. Clean Harbors Env't Servs., Inc.*, 840 F.3d 515, 520 (8th Cir. 2016) (emphasis added); *see also Jefferson County II*, 146 F.4th at 662. "Although a defendant has a duty to 'apply a reasonable amount of intelligence to its reading' of any such document received from the plaintiff, a defendant has no duty 'to search its own business records or perform an independent investigation into a plaintiff's indeterminable allegations to determine removability.'" *Gibson*, 840 F.3d at 519–20 (quoting *Graiser v. Visionworks of Am., Inc.*, 819 F.3d 277, 285 (6th Cir. 2016)). "If removability is not apparent from the allegations of such document sent from the plaintiff, [the] thirty-day time period does not begin to run." *Id.* (cleaned up).

122. There is no bar under § 1446(b)(3) to multiple removals. *City of Creve Coeur v. DirecTV LLC*, 58 F.4th 1013, 1016 (8th Cir. 2023) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 493 (5th Cir. 1996)). "The prohibition against removal 'on the same ground' does not

concern the theory on which federal jurisdiction exists (i.e., federal question or diversity jurisdiction), but rather the pleading or event that made the case removable." *S.W.S. Erectors*, 72 F.3d at 492 (citing cases). And "the fact that a case was initially removed and remanded does not itself preclude removal a second time around. A defendant who fails in an attempt to remove on the initial pleadings can file a second removal petition *when subsequent pleadings or events reveal a new and different ground for removal* . . . . By adding the second paragraph of § 1446(b), Congress intended that a party be permitted successive removals." *Id.* at 493. In short, a successive removal is "valid" when it "alleges new facts in support of the same theory of removal." *Id.*

123. Here, the 2026 Expert Reports provide a "new" and "different" factual basis for removal. As discussed above, they reveal that the County's proposed abatement plan rests on harms and remedies tied to federal plans and Optum Rx's work under color of federal office.

124. The last time that Optum Rx removed this case to federal court, the Eighth Circuit held that the County's service of the Red Flag Analysis triggered the 30-day clock to remove, meaning Optum Rx's removal based on later-served expert reports that relied on the Red Flag Analysis was untimely. *Jefferson County II*, 146 F.4th at 663.

125. The County has abandoned the Red Flag Analysis, which the Eighth Circuit previously held served as the basis for removability and triggered the 30-day removal clock. On October 1, 2026, the County served a new report from a newly disclosed expert, Dr. Kolodny, that relies on a never-before-disclosed national survey that implicates Optum Rx's work under color of federal office and that underpins the County's new proposed abatement plan. Dr. Kolodny's report therefore provides new facts underlying a new theory for abatement triggering Optum Rx's right to remove. *See also Gibson*, 840 F.3d at 522 (holding that time for removal was not triggered until service of expert report that for the first time enabled the defendant to determine

unambiguously that case was removable); *Parish of Plaquemines v. Chevron USA, Inc.*, 7 F.4th 362, 366–67, 372 (5th Cir. 2021) (same); *see also Andrews v. 3M Co*., 2014 WL 12615710, at *2 (D.S.C. Feb. 6, 2014) (30-day removal clock triggered only when removing Defendants became "aware of whether Plaintiffs' claims were based on products that may give rise to a government contractor defense").

126. This notice of removal is therefore timely filed under 28 U.S.C. § 1446(b)(3).

**C. Written Notice Of Removal.**

127. In compliance with 28 U.S.C. § 1446(a) and the rules of this Court, true and correct copies of all process, pleadings, and orders previously served on the PBMs in the state court are attached as Exhibit A (operative state court complaint) and Exhibit B (complete state court record), along with the state court docket sheet, which is attached as Exhibit C.

128. In accordance with 28 U.S.C. § 1446(d), Optum Rx will give written notice of the filing of this Notice of Removal to the County, which is the only adverse party, and will file a copy of this Notice with the Clerk of the Jefferson County Circuit Court.

## VI. NO WAIVER

129. Nothing in this Notice of Removal should be interpreted as a waiver or relinquishment of any of Optum Rx's rights to assert any and all defenses or objections.

130. If there are any questions that arise as to the propriety of removal, Optum Rx respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal.

131. Optum Rx reserves the right to amend or supplement this Notice of Removal.

## VII. CONCLUSION

Accordingly, Optum Rx gives notice of the removal of this case from the Missouri Circuit Court, Twenty-Third Judicial Circuit for Jefferson County, to the United States District Court for the Eastern District of Missouri, Eastern Division.

Dated: November 2, 2026.

Respectfully submitted,

*/s/ Bradley J. Schlozman*

Bradley J. Schlozman
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
T: (316) 267-2000
F: (316) 630-8466
bschlozman@hinklaw.com

*Counsel for OptumRx, Inc.*